## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

**ALBERT WILLIAMS,**

      **Petitioner,**

**vs.**

                               **CASE NO. 4:04cv496-RH/WCS**

**JAMES McDONOUGH,[1]**

      **Respondent.**

_____/

## REPORT AND RECOMMENDATION

This is a petition for writ of habeas corpus filed by Albert Williams pursuant to 28 U.S.C. § 2254.  Docs. 1 (petition) and 14 (memorandum in support of petition).  Petitioner challenges his convictions for manslaughter, two counts of felony fleeing and eluding an officer, possession of cocaine with intent to sell or deliver, and resisting an officer without violence, in the Circuit Court of the Second Judicial Circuit, in and for Leon County, Florida, case number R99-992-AF.  Respondent filed part of the record,

---

[1] James McDonough succeeded James Crosby as Secretary for the Department of Corrections, and is automatically substituted as Respondent.  Fed.R.Civ.P. 25(d).

Exhibits A-F, doc. 9, and an answer and more of the record, Exhibits G-J, doc. 17, and

Petitioner filed a traverse, doc. 20.

Respondent also moved to dismiss, arguing that the petition was not timely filed.

Doc. 8.  I entered an order finding the timeliness argument to be unpersuasive.  Doc.

10.  That order is incorporated herein by reference.

**Procedural History**

Petitioner was originally convicted of second degree murder (count one), felony

fleeing and eluding an officer (counts two and three), possession of cocaine with intent

to sell or deliver (count four), and resisting an officer without violence (count five).  Doc.

9, Ex. A, R. 24-28.  On November 16, 2001, the First District Court of Appeal affirmed

as to counts two through five, but reversed the second degree murder conviction and

remanded for entry of judgment and resentencing for manslaughter, thus not ruling on

other issues raised as to count one.  *Id.*, Ex. B; Williams v. State, 799 So. 2d 444 (Fla.

1st DCA 2001).

Petitioner was resentenced on the manslaughter conviction on January 16, 2002,

to a term of 15 years, consecutive to the consecutive sentences for counts two and

three, for a total of 45 years.[2]  *Id.*, Ex. A, R. 78-85.  An *Anders*[3] brief was filed on

appeal, and on December 5, 2002, the conviction for manslaughter was affirmed.  *Id.*,

Ex. D.

---

[2] Petitioner was sentenced to 15 year sentences on both counts two and three,
all to run consecutive to the sentence for count one.  Doc. 9, Ex. A, R. 31-41.

[3] Anders v. California, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967).

Petitioner filed a Rule 3.850 post-conviction motion raising four ineffective assistance of counsel claims.  *Id.*, Ex. E, R. 1-155.  The motion was denied by the trial court.  *Id.*, R. 156-200.  That order was affirmed on appeal.  *Id.*, Ex. F.  This federal petition for writ of habeas corpus followed.

**Trial evidence**

The following is a summary of the evidence at trial taken from Petitioner's amended brief on direct appeal.  Doc. 9, Ex. H.  The offenses (a police chase resulting in a motor vehicle accident causing the death of another person) occurred in the early morning hours of March 12, 1999.  *Id.*, p. 2.  Petitioner pulled up to Perry's Lounge on All Saints Street, Tallahassee, Florida, in his car, and three police officers approached to investigate why he had not exited the vehicle.  *Id.*  One officer saw Petitioner twisting what looked like a marijuana "joint" in his hand, and the other saw what appeared to be a "joint" and a plastic bag containing a "grassy" substance.  *Id.*, pp. 2-3.  Petitioner started the car and drove off, ignoring commands to stop.  *Id.*, p. 3.  He ran a stop sign turning right (north) at Railroad Road [sic, Avenue] as he left the area.  *Id.*

One of the officers radioed the description of the vehicle and, when asked if he thought Petitioner had a felony quantity of marijuana, said yes, it could be.  *Id.*, p. 4.  Another officer in a police car located Petitioner's vehicle at Stadium Drive and Pensacola Street, fell in behind on Pensacola Street, and tried to make a traffic stop, activating his lights and siren.  *Id.*, pp. 5-6.  Petitioner's vehicle was traveling 45 miles per hour on Pensacola Street going west, and though the speed limit is 30 miles per hour, cars normally go 40 to 45 miles per hour on that street.  *Id.*  Petitioner increased his speed, pulling away at 65 miles per hour.  *Id.*, p. 6.  At the intersection of Ocala and

Pensacola, Petitioner ran a red light and nearly hit another vehicle turning right onto Pensacola from Ocala.  *Id.*  The pursuing officer turned off his pursuit lights, waiting for the red light to turn green, and then pursued, observing Petitioner weaving in and out of traffic ahead on Pensacola.  *Id.*

The pursuit continued out Pensacola Street to Capital Circle, where Petitioner turned right (north).  *Id.*, pp. 6-7.  By this time, Deputy Sheriffs of the Leon County Sheriff's Office had taken up the pursuit.  *Id.*, pp. 7-9.  Because the Leon County Sheriff's radios do not communicate with the Tallahassee Police Department (TPD) radios, the pursuing Deputy Sheriffs were uncertain whether there was evidence that Petitioner possessed a felony quantity of marijuana.  *Id.*, pp. 7-9.  However, Deputy Cohen was with Tallahassee Police Sergeant Donaldson, and Donaldson told Cohen what had been transmitted over the TPD radio.  *Id.*, pp.7-8.  Cohen became one of the pursuers.  *Id.*, p. 9.  Also, Deputy Pearson was with TPD officers, heard the radio transmissions, and relayed that information to the Sheriff's Department.  *Id.*  Pearson said it was unclear whether a felony quantity of marijuana was involved, but after Cohen started the pursuit, he confirmed that a felony quantity was involved.  *Id.*, pp. 9-10.

Petitioner was going 80 miles per hour when he ran a red light at the crossing of Capital Circle Northwest (Highway 267) and West Tennessee Street (Highway 90).  *Id.*, pp. 10-11.  He ran a red light at Capital Circle and Tharpe Street.  *Id.*, p. 11.  Petitioner continued at this high rate of speed until he collided with a van under the overpass where I-10 goes over Capital Circle Northwest; Petitioner was traveling in the outside lane of the four lane divided road when his vehicle collided with a van.  *Id.*, pp. 11-12.  Petitioner was in possession of 28 small bags of cocaine.  *Id.*, p. 13.  Though not

mentioned in either Petitioner's or Respondent's brief, the collision killed Shannon

Stewart, who was in the van.  Doc. 9, Ex. G (trial transcript), pp. 288-291.

## Section 2254 Standard of Review

"Federal habeas relief is available to state prisoners only after they have

exhausted their claims in state court.  28 U.S.C. §§ 2254(b)(1), (c)."  O'Sullivan v.

Boerckel, 526 U.S. 838, 839, 119 S.Ct. 1728, 1730, 144 L.Ed.2d 1 (1999).  To properly

exhaust remedies as required by § 2254(b), "the federal claim must be fairly presented

to the state courts."  Picard v. Connor, 404 U.S. 270, 275, 92 S.Ct. 509, 512, 30 L.Ed.2d

438 (1971), Duncan v. Henry, 513 U.S. 364, 365, 115 S.Ct. 887, 888, 130 L.Ed.2d 865

(1995) (citing Picard).

If a claim was not fairly presented but is procedurally barred from further state

court review,[4] Petitioner must demonstrate cause for the default and actual prejudice, or

demonstrate that the constitutional violation has probably resulted in conviction of an

innocent person.  Coleman v. Thompson, 501 U.S. 722, 750, 111 S.Ct. 2565, 115

L.Ed.2d 640 (1991); McCleskey v. Zant, 499 U.S. 467, 494-95, 111 S.Ct. 1454, 1470-

71, 113 L.Ed.2d 517 (1991).

For claims which were properly exhausted and adjudicated in state court, this

court's review is limited.  "[A] determination of a factual issue made by a State court

shall be presumed to be correct," and Petitioner has "the burden of rebutting the

presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1);

---

[4] Procedurally defaulted claims are considered technically exhausted because
state court remedies no longer remain "available."  The court therefore refers to "fairly
presented" claims as having been properly exhausted, to distinguish them from claims
exhausted by procedural default.  See O'Sullivan, 526 U.S. at 848, 119 S.Ct. at 1734.

Bui v. Haley, 321 F.3d 1304, 1322 (11th Cir. 2003) (citing the statute, footnote omitted).

Moreover, as to a factual issue adjudicated by the state court, Petitioner must show that

the adjudication "resulted in a decision that was based on an unreasonable

determination of the facts in light of the evidence presented in the State court

proceeding." § 2254(d)(2); 321 F.3d at 1322 (citing the statute).  Section 2254(d)(2) is

satisfied "only if it is shown by clear and convincing evidence that the state court's

presumptively correct factual findings do not enjoy support in the record."  Lomholt v.

Iowa, 327 F.3d 748 , 752 (8th Cir. 2003) (citing § 2254(e)(1), other citation omitted).

As to legal findings, a petitioner is entitled to federal habeas relief only if the state

court's adjudication of the merits of the federal claim "resulted in a decision that was

contrary to, or involved an unreasonable application of, clearly established Federal law,

as determined by the Supreme Court of the United States." § 2254(d)(1).

The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) have

independent meanings.  Williams v. Taylor, 529 U.S. 362, 404-406, 120 S.Ct. 1495,

1519-1520, 146  L.Ed.2d 389 (2000); Bell v. Cone, 535 U.S. 685, 694, 122 S.Ct. 1843,

1850, 152 L.Ed.2d 914 (2002) (citing Williams).  "[C]learly established Federal law, as

determined by the Supreme Court of the United States," refers only to holdings of the

Supreme Court, but decisions of lower federal courts may be considered to the extent

that they demonstrate how those courts applied Supreme Court  precedent.  Hawkins v.

Alabama, 318 F.3d 1302, 1309 (11th Cir. 2003) (citations omitted).

> Under the "contrary to" clause, a federal habeas court may grant the writ if
> the state court arrives at a conclusion opposite to that reached by [the
> Supreme] Court on a question of law or if the state court decides a case
> differently than this Court has on a set of materially indistinguishable facts.
> Under the "unreasonable application" clause, a federal habeas court may

> grant the writ if the state court identifies the correct governing legal
> principle from this Court's decisions but unreasonably applies that
> principle to the facts of the prisoner's case.

529 U.S. at 412-413, 120 S.Ct. at 1523; 535 U.S. at 694, 122 S.Ct. at 1850.

The law governing ineffective assistance of counsel claims was clearly established in Strickland v. Washington, 466 U.S. 668, 690, 694, 104 S.Ct. 2052, 2066, 2068, 80 L.Ed.2d 674 (1984). Williams, 529 U.S. at 405-406, 120 S.Ct. at 1519-1520; Bell, 535 U.S. at 694-695, 122 S.Ct. at 1850. Under the two part test of Strickland, Petitioner must demonstrate both deficient performance and prejudice to the outcome.

To establish deficient performance, a petitioner "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." 466 U.S. at 690, 104 S.Ct. at 2066. In reviewing the claim, "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." 466 U.S. at 690, 104 S.Ct. at 2066. Petitioner has a heavy burden to establish the deficient performance prong of Strickland, by showing that "no competent counsel would have taken the action that his counsel did take." Fugate v. Head, 261 F.3d 1206, 1217 (11th Cir. 2001) (citation omitted). There are no rigid requirements, or absolute duty to investigate a particular line of defense. Id.

> Indeed, "[c]onsidering the realities of the courtroom, more is not always
> better. Stacking defenses can hurt a case. Good advocacy requires
> 'winnowing out' some arguments, witnesses, evidence, and so on, to
> stress others."

261 F.3d at 121 (citations omitted).

For prejudice, Petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."  466 U.S. at 694, 104 S.Ct. at 2068.

Although Strickland explained the performance and prejudice prongs of analysis, "there is no reason . . . to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697, 104 S.Ct. at 2069.  "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."  *Id.*

If the state court identifies and applies the framework of Strickland in assessing an ineffective assistance claim, its adjudication does not satisfy the "contrary to" language of § 2254(d)(1) even if this court might have applied Strickland differently. Williams, 529 U.S. at 406, 120 S.Ct. at 1520; Bell, 535 U.S. at 698, 122 S.Ct. at 1852. To determine whether the state court's adjudication was an "unreasonable application" of Strickland, Petitioner "must do more than show that he would have satisfied *Strickland's* test if his claim were being analyzed in the first instance . . . .  Rather, he must show that the [state court] applied *Strickland* to the facts of his case in an objectively unreasonable manner."  Bell, 535 U.S. at 698-699, 122 S.Ct. at 1852 (*citing* Williams).  "[T]he most important point is that an *unreasonable* application of federal law is different from an *incorrect* application of federal law."  Williams v. Taylor, 529 U.S. at 410, 120 S.Ct. at 1522.

**Legal analysis**

**Ground One:  Improper closing argument in violation of due process**

Petitioner contends that in closing argument, the prosecutor improperly used a pistol as a demonstrative exhibit, though the offense did not involve a firearm.  He also argues that the prosecutor made several improper comments to the jury.  Doc. 1, pp. 4a-4b.

Respondent argues that Petitioner raised these claims only as state law issues, and thus the federal claims are procedurally defaulted.  Doc. 17, p. 12, citing doc. 9, Ex. H, pp. 26-30 (Petitioner's brief on appeal).

> "In order to be exhausted, a federal claim must be fairly presented to the state courts."  *McNair v. Campbell*, 416 F.3d 1291, 1301-02 (11th Cir. 2005).  "It is not sufficient merely that the federal habeas petitioner has been through the state courts . . . nor is it sufficient that all the facts necessary to support the claim were before the state courts or that a somewhat similar state-law claim was made."  *Kelley v. Sec'y for Dept. of Corr.*, 377 F.3d 1317, 1343-44 (11th Cir. 2004) (citations omitted).  Rather, federal courts "have required a state prisoner to present the state courts with the same claim he urges upon the federal courts."  *Picard v. Connor*, 404 U.S. 270, 276, 92 S.Ct. 509, 512, 30 L.Ed.2d 438 (1971).  "While we do not require a verbatim restatement of the claims brought in state court, we do require that a petitioner presented his claims to the state court such that a reasonable reader would understand each claim's particular legal basis and specific factual foundation."  *McNair*, 416 F.3d at 1303 (internal quotation marks and citations omitted).

LeCroy v. Secretary, Florida Dept. of Corrections, 421 F.3d 1237, 1260 n. 24 (11th Cir. 2005), *cert. denied*, 126 S.Ct. 1458 (2006) (finding that a federal claim concerning a statement made by the trial court to a jury was not the same as a federal claim that appellate counsel was ineffective for failing to raise this claim on appeal).

On direct appeal, Petitioner (represented by counsel) argued that the prosecutor's comments in closing argument and use of a pistol "constituted reversible

error."  Doc. 9, Ex. H, p. 25.  Petitioner first argued that use of the firearm was error because "demonstrative evidence must be an accurate and reasonable reproduction of the object involved," citing <u>Brown v. State</u>, 550 So. 2d 527, 528-29 (Fla. 1st DCA 1989), *review denied*, 560 So. 2d 232 (Fla. 1990).  *Id.*, p. 26.  Petitioner argued that it was error to use a firearm in closing argument because "[t]here was no evidence adduced that a firearm was involved in Appellant's case."  *Id.*  The <u>Brown</u> case cited other state law cases, and focused upon the state law rules governing use of demonstrative exhibits in closing argument.  This argument, concerning the state rules for use of demonstrative exhibits in closing argument, did not fairly present a federal due process claim.

Petitioner also argued on appeal that it was error to use the pistol in closing argument because it could reasonably be expected to evoke an emotional response from the jurors.  Cited for this was <u>Taylor v. State</u>, 640 So. 2d 1127 (Fla. 1st DCA), *review denied*, 649 So. 2d 235 (1994).  In <u>Taylor</u>, the two murder victims had died from blows to the head with a hammer.  640 So. 2d at 1130.  The court held that the use of clay heads with a distinctly feminine appearance in closing argument had little bearing upon the issue before the jury (defendant's sanity at the time of the offense), and "was certain to evoke an emotional response."  *Id.* at 1133, citing <u>Brown</u>.  Petitioner cited <u>Taylor</u> on direct appeal for the proposition that in closing argument, the prosecutor must not try to "inflame the minds and passions of the jurors so that their verdict reflects an emotion response to the crime or the defendant."  Doc. 9, Ex. H, p. 28, citing <u>Taylor</u>, 640 So. 2d at 1134.

The same legal basis (inappropriate use of inflammatory closing arguments) underlies Petitioner's claim concerning comments made by the prosecutor in closing

argument.  Petitioner cited mostly state cases dealing with the limits upon prosecutorial

argument.  Doc. 9, Ex. H, pp. 33-36.  The only federal cases cited were United States v.

Young, 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985) and United States v.

Mandelbaum, 803 F.2d 42, 44 (1st Cir. 1985).  *Id.*, p. 33.  The Young and Mandelbaum

cases, however, were federal criminal cases on appeal, and like the state cases, both

concerned only the procedural rules governing proper prosecutorial argument.  The Due

Process Clause was not mentioned in either opinion.

The state law underlying Petitioner's claims as to inflammatory argument,

however, is the following:

> A trial court's rulings with regard to the relevancy and admissibility of
> evidence, and rulings concerning prosecutorial comments, are subject to
> an abuse of discretion standard of review.  *See Durocher v. State*, 596 So.
> 2d 997, 1000 (Fla.1992); *Howard v. State*, 616 So. 2d 484, 485 (Fla. 1st
> DCA 1993).  Improper prosecutorial comment is subject to a harmless
> error analysis, and will give rise to reversal of a conviction only if the
> comment is so prejudicial that it vitiates the entire trial.  *King v. State*, 623
> So. 2d 486 (Fla.1993); *Watts v. State*, 593 So. 2d 198 (Fla.), *cert. denied*,
> 505 U.S. 1210, 112 S.Ct. 3006, 120 L.Ed.2d 881 (1992).  "*The question is
> whether there is a reasonable possibility that the error affected the verdict*.
> The burden to show the error was harmless must remain on the state."
> *State v. DiGuilio*, 491 So. 2d 1129, 1138-1139 (Fla.1986).

Taylor v. State, 640 So. 2d at 1133.  This state rule is essentially the same as the

federal due process standard governing allegedly improper argument by the

prosecution.  As summarized by the Eleventh Circuit:

> To find prosecutorial misconduct, a two-element test must be met:  "'(1)
> the remarks must be improper, and (2) the remarks must prejudicially
> affect the substantial rights of the defendant.' " *United States v. Gonzalez*,
> 122 F.3d 1383, 1389 (11th Cir.1997) (quoting *United States v. Eyster*, 948
> F.2d 1196, 1206 (11th Cir.1991)); *see also United States v. Thomas*, 62
> F.3d 1332, 1343 (11th Cir.1995).  "*A defendant's substantial rights are
> prejudicially affected when a reasonable probability arises that, but for the
> remarks, the outcome [of the trial] would be different.*"  *United States v.*

      *Hall*, 47 F.3d 1091, 1098 (11th Cir.1995) (citing *Kennedy v. Dugger*, 933
      F.2d 905, 914 (11th Cir.1991)).  The court makes this determination in the
      "'context of the entire trial and in light of any curative instruction.' "  *United
      States v. Chirinos*, 112 F.3d 1089, 1098 (11th Cir.1997) (quoting *United
      States v. Beasley*, 72 F.3d 1518, 1525 (11th Cir.1996)); *Thomas*, 62 F.3d
      at 1343 (curative instruction may render prejudicial remark harmless).

United States v. Wilson, 149 F.3d 1298, 1301 (11th Cir. 1998) (emphasis added).[5]

      Accordingly, it is not entirely clear that Petitioner procedurally defaulted his

federal due process claim, at least with respect to the use of allegedly inflammatory

arguments in closing.  However, "[a]n application for a writ of habeas corpus may be

denied on the merits, notwithstanding the failure of the applicant to exhaust the

remedies available in the courts of the State."  28 U.S.C. § 2254(b)(2).  It is easier here

to address the merits because the claim is without merit.

      On direct appeal, the First District Court of Appeal (two judges) expressed

misgivings about the prosecution's use of the firearm in closing, but found that any

impropriety was harmless:

      We would note that we do not condone the prosecutor's use of a firearm
      as a demonstrative tool during closing argument in a case where no
      firearm was involved, but conclude that any harmful effect this conduct
      may have had on the jury's verdict is remedied by our decision to reduce
      the degree of appellant's homicide charge.

799 So. 2d at 444 n. 1.  The state court did not discuss the allegedly improper closing

comments.  *Id*.  The court's silence as to those claims is probably an implicit ruling that

---

     [5] *See* Donnelly v. DeChristoforo, 416 U.S. 637, 643-645, 94 S.Ct. 1868, 1871-
1872, 40 L.Ed.2d 431 (1974) (Prosecutorial argument does not constitute reversible
error unless the argument renders the trial so fundamentally unfair as to amount to a
denial of due process, or unless the statement so prejudices another specific
constitutional right, such as the privilege against self-incrimination, as to amount to
denial of that specific right.).

the reversal of the second degree murder conviction likewise rendered any error as to those comments harmless error.

In final argument, Petitioner's attorney tracked the standard jury instruction, arguing that to prove second degree murder, the State had to prove that Petitioner's actions were "imminently dangerous to another and demonstrat[ed] a depraved mind without regard for human life." Doc. 9, Ex. G (trial transcript), p. 442. Also using the expected jury instructions, he argued that this required proof of "ill will, hatred, spite, or an evil intent."[6]  *Id.*  He argued that the State had not proved a "depraved mind." *Id.*, p. 443. Petitioner's attorney also argued that the jury could convict of manslaughter, culpable negligence, or vehicular homicide. *Id.* He argued that Petitioner tried to avoid the collision, and therefore, did not have the requisite state of mind for conviction for second degree murder. *Id.*, pp. 447-448. He argued that the evidence instead showed

---

[6] Second degree murder is:

The unlawful killing of a human being, when perpetrated by any act imminently dangerous to another and evincing a depraved mind regardless of human life, although without any premeditated design to effect the death of any particular individual. 782.04(2), Fla. Stat. The phrase imminently dangerous to another and evincing a depraved mind regardless of human life has been described by this court to mean an act or series of acts that:

   1.   a person of ordinary judgment would know is reasonably
         certain to kill or do serious bodily injury to another, and

   2.   is done from ill will, hatred, spite or an evil intent, and

   3.   is of such a nature that the act itself indicates an indifference
         to human life.

Jones v. State, 908 So. 2d 615, 619 (Fla. 4th DCA 2005), quoting *Sigler v. State*, 805 So. 2d 32, 34 (Fla. 4th DCA 2001), *rev. denied,* 823 So. 2d 126 (Fla.2002).

only manslaughter by culpable negligence, and explained that "culpable negligence is a course of conduct showing a reckless disregard of human life or of the safety of persons exposed to its dangerous effects . . . ."[7]  *Id.*, pp. 450-452.  He argued that the court would instruct that the object of the dangerous actions in second degree murder is "another," a specific person, while the object of the dangerous actions in manslaughter is more general, "others," and he argued that the dangerous actions of Petitioner were only directed at "others," not toward a specific person.  *Id.*, pp. 452, 456.

Petitioner's attorney then read the elements of vehicular homicide.  *Id.*, pp. 457-458.  He did not, however, make any argument that the facts justified a verdict for vehicular homicide.  *Id.*, p. 458.

The prosecutor argued for a verdict for second degree murder, focusing upon the "depraved" mind element.  *Id.*, pp. 460-461.  The prosecutor went over the trial evidence, arguing that Petitioner's actions showed a depraved mind.  *Id.*, pp. 461-470.  He then took up the handgun, pointing it at himself and at his co-counsel, clicking it, and then arguing that each click on an empty chamber was Petitioner running through a red

---

[7]  Culpable negligence is:

"[C]onduct of a gross and flagrant character, evincing reckless disregard of human life, or of safety of persons exposed to its dangerous effects, or the entire want of care which would raise presumption of conscious indifference to consequences or which shows wantonness or recklessness or grossly careless disregard of safety and welfare of public, or that reckless indifference to rights of others, which is equivalent to an intentional violation of them."  Getsie v. State, 193 So.2d 679 (Fla. 4th DCA 1967) (quoting *Miller v. State*, 75 So.2d 312 (Fla.1954)).

Sapp v. State, 913 So. 2d 1220, 1224 (Fla. 4th DCA 2005).

light at a high speed; he ended with a mock firing, which was the collision.  *Id.*, pp. 470-472.

Likewise, the prosecutorial comments that are the subject of Petitioner's claims were all made to bolster the prosecutor's argument that the jury should convict of second degree murder and not some lesser included offense.  *Id.*, pp. 473 ("show me compassion" and "compassion and mercy"; 474 ("your job to let him know"); 476 ("does justice"); 479 ("seriousness of the offense," "human life was lost" and "hold him accountable").

In summary, even if these prosecutorial arguments were error, the error was harmless beyond a reasonable doubt because the second degree murder conviction was vacated.  The arguments could not have affected a jury verdict for manslaughter because the evidence for conviction of manslaughter (reckless disregard for human life) was substantial.  Driving at a high rate of speed through red light after red light, and refusing to stop when required to do so by a pursuing police car with its blue lights on, is reckless disregard for human life.  That was the conclusion of the First District Court of Appeal.  Thus, assuming that court of appeal was then deciding the federal claim, Petitioner has not shown that the state court's adjudication of the merits of this federal claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  § 2254(d)(1).

**Ground Two:  Whether Petitioner was denied his Sixth Amendment right to cross examine a witness about the Leon County Sheriff's pursuit policy**

This claim also comes from Petitioner's brief on direct appeal.  Doc. 9, Ex. H, p. 38.  Petitioner contends it was error to deny his right to cross examine Deputy Pearson about the Sheriff's pursuit policy.  The trial court ruled that the pursuit policy was not a defense.  Petitioner contends that these rulings denied him an opportunity to impeach a witness, Deputy Cohen, by showing that Cohen initiated his own pursuit in violation of this policy.  The theory of this line of impeachment appears to be that since Cohen violated a policy, he had a motive to lie about the speed that Petitioner was traveling when he collided with the van.  Respondent concedes exhaustion of state court remedies as to this claim.

Analysis of this claim requires close attention to the evolution of this chase.  It began when Petitioner was seen in possession of what appeared to be marijuana.  If the grassy substance was marijuana, and even if the quantity would have only supported a misdemeanor charge, the officers were authorized to arrest Petitioner at that point.  "[A] law enforcement officer may arrest a person without a warrant when the person has committed a felony or misdemeanor in the presence of the officer."  Rucker v. State, 921 So. 2d 857, 860 (Fla. 2d DCA 2006), citing FLA. STAT. § § 901.15(1) (2003).  At a minimum, the officers were authorized to briefly detain Petitioner to investigate further as to whether the grassy substance was marijuana.[8]

---

[8] Some brief detentions by law enforcement officers do not rise to the level of an arrest and may be supported by less than probable cause.

Police officers may engage in a brief investigatory detention of a person if they have reasonable, articulable suspicion based on objective facts that

Petitioner was asked to roll down his window for further inquiries.  Instead of obeying the officers, Petitioner drove away in his car, running a stop sign.  As a consequence, the law enforcement officers had good cause to follow to issue a ticket for running the stop sign.  Additionally, they continued to have good cause to detain Petitioner briefly to investigate whether he had possession of marijuana.  The police were justified to follow Petitioner's car and to try to pull him over for this investigation.

Petitioner refused to pull over on Pensacola Street when the following officer activated his police blue lights and siren, and Petitioner then fled at 65 miles per hour in a 30 miles per hour speed zone, ran a red light at the intersection with Ocala Street, and nearly hit a car.  At this point, Petitioner committed a felony in the second degree in the presence of the pursuing officers.  FLA. STAT. § 316.1935(3)(a).  Petitioner thereafter ran stop light after stop light at a very high rate of speed, committing additional second degree felonies.  Likewise, as Petitioner passed Deputy Cohen, Petitioner was committing a felony in the presence of Deputy Cohen.

None of these felonies were caused by the officers.  Petitioner should have pulled over on Pensacola when the blue lights first went on, while he was still driving at a relatively safe speed.

---

the person has been, is or is about to be engaged in criminal activity.

United States v. Franklin, 972 F.2d 1253, 1257 (11th Cir. 1992), citing Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).  "A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officers at the time."  Adams v. Williams, 407 U.S. 143, 146, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972) (citing Terry, 392 U.S. at 21-22).

In summary, whether or not Petitioner had a felony or a misdemeanor quantity of marijuana in his possession originally was irrelevant to the issue of whether Cohen violated a felony pursuit policy.  Petitioner committed other felonies in the presence of all of the officers.

Thus, this line of cross examination was of no relevance at all, as recognized by the state trial court, whether as a defense or to impeach Cohen.  Consequently, no Confrontation Clause violation has been shown.  "[A] trial court retains 'wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.' " United States v. Lyons, 403 F.3d 1248, 1255-1256 (11th Cir.), cert. denied, 126 U.S. 732 (2005 (citations omitted).  Ground two is without merit.

### Ground Three:  Whether counsel was ineffective for failing to request a jury instruction for the lesser included offense of simple possession of cocaine.

Petitioner was convicted as to count four of possession of cocaine with intent to sell.  He argues that had his lawyer asked for an instruction on the lesser included offense of simple possession, the jury might reasonably have exercised its "jury pardon" discretion.  Respondent concedes exhaustion of state court remedies.

The trial court rejected this claim, finding that there was evidence that Petitioner had possession of the cocaine in 28 small plastic baggies.  Doc. 9, Ex. E, R. 157.  The court also noted that Detective Cohen testified that the cocaine was packaged for sale. Id.  The court concluded that an instruction on simple possession would have been

inconsistent with this evidence, and found neither attorney error not prejudice to the outcome. *Id*.

An instruction on simple possession is not a necessary lesser included offense of drug trafficking in Florida, but it is a permissive lesser included offense where, as here, the drug trafficking is alleged to have been possession with intent to sell; an instruction on simple possession must be given in Florida unless there is "a total lack of evidence of the lesser offense." Wardell v. State, 901 So. 2d 289, 290 (Fla. 5th DCA 2005), citing Amado v. State, 585 So. 2d 282 (Fla.1991).  Thus, it may be assumed for the sake of argument, that it was attorney error to fail to request this instruction.

Prejudice to the outcome has not been shown, however.  The possibility of a jury pardon is not a permissible part of the calculus of prejudice to the outcome for a claim of ineffective assistance of counsel.

> In making the determination whether the specified errors resulted in the required prejudice, a court should presume, absent challenge to the judgment on grounds of evidentiary insufficiency, that the judge or jury acted according to law.  An assessment of the likelihood of a result more favorable to the defendant must exclude the possibility of arbitrariness, whimsy, caprice, "nullification," and the like.  A defendant has no entitlement to the luck of a lawless decisionmaker, even if a lawless decision cannot be reviewed.

Strickland, 466 U.S. at 694-695, 104 S.Ct. at 2068.

Further, while one or two baggies might have been for personal use, there was no evidence at trial that 28 small plastic baggies of cocaine would have been consistent with personal use, and Petitioner does not offer such evidence now.  No jury would have pardoned him for this offense, given the aggravating circumstances of the other offenses.  Petitioner has not shown that the state court's adjudication of the merits of

this federal claim "resulted in a decision that was contrary to, or involved an

unreasonable application of, clearly established Federal law, as determined by the

Supreme Court of the United States." § 2254(d)(1).

### Ground Four:  Whether counsel was ineffective for failing to object to two instances of expert opinion testimony by Deputy Cohen

Petitioner raises the same claims here as he did in his Rule 3.850 motion.  He

argues that his attorney was ineffective in failing to object to Deputy Cohen's expert

testimony as to the meaning of the packaging of the cocaine found in Petitioner's

possession.  Additionally, Petitioner contends that his attorney was ineffective for failing

to object to testimony by Cohen as an expert in traffic accident reconstruction.

Petitioner argues that although Cohen was not tendered as an expert in traffic accident

reconstruction, he was allowed to testify without objection as to his estimate that

Petitioner was traveling 80 miles per hour at the point of the accident.  Respondent

concedes exhaustion of state court remedies as to these claims.

The trial court rejected these claims.  First, the court found that Cohen was

qualified by the prosecution as an expert in drug interdiction. Doc. 9, Ex. E, R. 158,

citing pages 180-183 of the trial transcript (Ex. D, R. 174-177).  Cohen testified that he

had seen the ways that powder cocaine is packaged both for sale and for personal use,

having seen over 100 instances of drugs as they were packaged.  Ex. D, R. 175-176.

Although Petitioner's attorney made no objection to the tender of Cohen as an expert

witness in "street level narcotics," *id.*, R. 177, Petitioner does not now identify the

objection that might have been made, and that is fatal to the claim.[9]  Further, testimony

of this sort is commonly allowed in drug criminal trials, where the amount of the drug

and the packaging indicates intent to sell.  Lewis v. State, 754 So. 2d 897, 901 (Fla. 1st

DCA 2000).  No attorney error has been shown as to this issue.

As to the claim that counsel was ineffective for failing to object to testimony that

should have come from an expert in traffic accident reconstruction, the trial court noted

that Petitioner's trial counsel did object to testimony by Cohen describing the accident

scene.  Doc. 9, Ex. E, R. 158, citing the trial transcript, pp. 201-202.  Cohen was asked

to testify as to whether "there is a substantial curve [in the road] north of Hartsfield Road

in the area of Brittany Estates."  Doc. 9, Ex. G, p. 201.  Counsel for Petitioner objected

that Cohen was not qualified as a traffic expert.  Id.  The trial court overruled the

objection, finding that Cohen was qualified to describe a curve in the road that he had

observed.  Id.,p. 202.  This ruling is correct.  As to this matter, Cohen was simply

describing something he had observed.  Neither attorney error nor prejudice to the

outcome has been shown.

Petitioner, however, argues that his attorney should have objected when later in

his testimony, Cohen estimated that Petitioner had been going 80 miles per hour at the

point of impact.  Cohen testified that one of the tires was "well down Capital Circle to the

---

[9] "A convicted defendant making a claim of ineffective assistance of counsel must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment."  Strickland, 466 U.S. at 690, 104 S.Ct. at 2066. "Conclusory allegations of ineffective assistance are insufficient." Wilson v. United States, 962 F.2d 996, 998 (11th Cir. 1992) (drug quantity at sentencing, failure to allege specific facts), quoting, United States v. Lawson, 947 F.2d 849, 853 (7th Cir. 1991) (same).

north," and some headlight assemblies were found north of the impact scene as well. Doc. 9, Ex. A (trial transcript), p. 222.  He was shown a photograph, and identified a tire connected to a severed axle and the location of the tire and axle relative to the location of Petitioner's vehicle after the impact.  *Id.*  Looking at the photograph and using his memory, Cohen said that the tire was about 100 yards away from the rest of Petitioner's vehicle.  *Id.*, pp. 222-223.  Cohen was then asked if that evidence assisted him "in determining the consistent speed of 80 miles per hour at the time of impact," and Cohen said yes, it "would support it."  *Id.*, p. 223.  Counsel for Petitioner did not object to this testimony, and it is this lack of objection that forms the basis of this claim.

In ruling on the claim in the Rule 3.850 motion, the trial court noted that Petitioner's counsel did object to earlier testimony by Cohen, estimating Petitioner's speed to have been 80 miles per hour.  Since an objection was made, the trial court rejected the ineffective assistance of counsel claim, reasoning that "this is an issue which could or should have been raised on appeal and is therefore denied as procedurally barred."  Doc. 9, Ex. E, R. 158.  This ruling confuses the ineffective assistance of counsel claim with the underlying issue as to which the objection had been or should have been lodged.  As such, there is no ruling by the trial court upon this particular ineffective assistance of counsel claim.

In the earlier testimony (as to which objection was made), Cohen said that he was trained in pacing behind a fleeing vehicle and he noted from his own speedometer that Petitioner was going a constant speed of 80 miles per hour from Pensacola Street to the point of impact.  Doc. 9, Ex. A (trial transcript), pp. 194, 196, 197, 198, 204, 206-207 (Petitioner was "pulling away" from Cohen just before the impact, as Cohen

disengaged).  Cohen observed that there was "massive damage" to both vehicles.  *Id.*,

p. 211.  Cohen then said that based upon his experience in the investigation of more

than 1,000 traffic accidents, the damage he saw to both vehicles was "consistent with"

the speed of pursuit he had earlier reported.  *Id.*, p. 216.  When asked whether

Petitioner's vehicle was actually going 80 miles per hour at the point of impact,

Petitioner's attorney objected and the objection was sustained.  *Id.*  Cohen was allowed

to repeat that the damage he observed was consistent with that speed.  *Id.*, p. 217.

Thus, Cohen's testimony as to the position of the tire and axle after impact, that it

was consistent with a speed of Petitioner's vehicle of 80 miles per hour, is not materially

different from the testimony concerning the correlation between the "massive" damage

to both vehicles and the estimated speed on impact.  Counsel's failure to raise another

objection may have been strategic, to avoid putting further emphasis on the conclusion,

or he may have deemed objection to be futile.

Further, a lay witness may testify as to an observation of "massive" damage to a

vehicle, and may give an estimate of the distance between two objects.  Indeed,

Cohen's estimate of distance was rather accurate.  By actual measurement, the tire and

axle were 375 feet from the point of impact.  *Id.*, p. 329.  In drawing the conclusion that

the results of the accident were consistent with a speed of 80 miles per hour on impact,

Cohen was testifying as an expert on this subject based upon his experience with over

1,000 traffic accidents.  More important, Cohen clocked Petitioner almost all the way to

the impact at 80 miles per hour, so even if this expert testimony was erroneous, no

prejudice to the outcome has been shown.  Ground four is without merit.

**Ground Five:  Whether counsel was ineffective for failing to call Alan Otley, a light control engineer, to refute the testimony of Donald Dobson, a senior traffic signal technician**

Petitioner contends that during the trial, there was conflicting evidence as to whether he had the right of way at the intersection of impact.  He argues that witness Roig testified that the light was yellow in transition to red.  A passenger in Roig's car, Becker, said that the light was not green when Roig approached the intersection of Capital Circle and the off-ramp from I-10.  The driver of the van involved in the collision, Mark Morgan, said that he stopped on a red light and entered the intersection on a green light.  Dobson testified that at the time of the collision, the light in question was set to a pattern of green, yellow, red (the "free" pattern), rather than flashing (with flashing yellow for Petitioner's vehicle).  Petitioner contends that his attorney should have called Alan Otley, a light control engineer, who he asserts was the only person qualified to testify to the light pattern that night.  Petitioner contends that as shown by his deposition, Otley would have testified that the light was on the flashing pattern when the accident occurred.  Respondent agrees that state court remedies have been exhausted as to this claim.

The trial court rejected this claim, noting that Dobson was a senior traffic signal technician with over thirteen years of experience, and his department establishes the traffic signal cycling patterns, impliedly finding that Dobson was qualified to interpret the data.  Doc. 9, Ex. E, R. 159.  The court also noted that Petitioner's attorney questioned Roig, Becker, and Morgan as to inconsistencies in their testimony as to the operation of the traffic light.  *Id*.  Finally, the court reasoned that "regardless of the traffic light pattern," the evidence showed that Petitioner was traveling at a high rate of speed.  *Id*.

The court reasoned that the failure to call Otley as a witness was not prejudicial to
Petitioner.  *Id.*

Richard Roig testified that at sometime after 1:00 a.m. on the night of the
accident, he was driving with a friend, David Becker.  Doc. 9, Ex. A (trial transcript), pp.
301-302.  He was leaving Interstate 10 down the off-ramp, and at the intersection with
Capital Circle, there was a signal light.  *Id.*, pp. 302-303.  Roig could not remember
whether the light was flashing or fixed, but he said he stopped briefly and then
proceeded across Capital Circle.  *Id.*, pp. 303, 308.  He said it was either flashing yellow
or red, but he knew it was a caution light.  *Id.*  Roig said that when he looked to the left,
he saw a car coming with parking lights on and no headlights, but he could see the car.
*Id.*, pp. 304, 308.  He crossed the two lanes of traffic and started a left turn onto Capital
Circle when he heard a crash behind him.  *Id.*, pp. 304-305.  He said that the oncoming
car was "a pretty good ways" away as he crossed.  *Id.*, p. 305.  He said there were two
vans behind him.  *Id.*, p. 308.  Roig said he would not have entered the intersection if
the light had been fixed red.  *Id.*, pp. 309-310.  He did not know if the van behind him
stopped before entering the intersection.  *Id.*, p. 311.

David Becker testified that he was a passenger in the vehicle driven by Roig.  *Id.*,
p. 314.  He "guessed" that the traffic signal was blinking.  *Id.*, p. 315.  He said he saw
Petitioner's oncoming car, and thought "there's another idiot driver with his headlights
off at night."  *Id.*, p. 316.  He said he definitely did not see parking lights and the vehicle
was traveling fast.  *Id.*  Becker said that as they were turning south (left) onto Capital
Circle, he saw the approaching car pass faster than the speed limit and heard a loud

bang and saw the van slide on its side. *Id.*, p. 317.  On cross examination, Petitioner's

attorney established that the light for them "definitely was not green." *Id.*, p. 319.

Mark Morgan testified that he was the driver of the lead van that night, and the

three vans were transporting a college baseball team. *Id.*, p. 355.  When he came off

the interstate on the ramp, there was one vehicle ahead of him. *Id.*, p. 357.  Morgan

said that the traffic light turned green, the car ahead pulled out, he followed, and "a

player in the back yelled, he's going to run the light." *Id.*, p. 358.  Morgan said the next

thing he knew, he woke up on the asphalt. *Id.*  On cross examination, Petitioner's

attorney confronted Morgan with a statement he provided to a police investigator

wherein he said he did not remember there being another vehicle ahead of him, did not

remember the color of the light at the intersection, and did not recall seeing a signal.

*Id.*, pp. 373, 374-375.  Morgan said that at the time he gave this statement, he was on

morphine for pain from his injuries. *Id.*, p. 373.  On redirect, Morgan said that the traffic

signal was initially red and he stopped. *Id.*, p. 377.  It then turned green and he

proceeded into the intersection. *Id.*

Donald Dobson testified that he was a senior traffic signal technician with the City

of Tallahassee. *Id.*, p. 256.  He had been employed in traffic engineering for 13 1/2

years. *Id.*  He is certified by various organizations to hold his position. *Id.*, p. 257.

Dobson had the responsibility to maintain the traffic signal at the intersection of Capital

Circle and the off ramp from Interstate 10. *Id.*  Dobson said that the intersection had

two signals facing the off ramp and two signals facing south for traffic northbound on

Capital Circle. *Id.*, pp. 260-261.  Dobson said that he had the ability, based upon

records maintained by his department, to determine the signal pattern for the day of the

collision.  *Id.*, p. 264.  Dobson printed the record for the signal pattern that day at that intersection.  *Id.*, p. 265.  He said that the signal went to a flashing pattern at 9:00 p.m. *Id.*, p. 266.  Traffic on Capital Circle would have had a flashing yellow light and the off ramp would have been flashing red.  *Id.*, p. 267.  At midnight, the pattern changed to the "free pattern," which is the green, yellow, red cycling sequence.  *Id.*  Dobson said that at about 1:00 a.m. on the day of the collision, the "free pattern" would have been operative.  *Id.*, p. 268.

Deputy Cohen testified that on the night in question, he was working the late night patrol shift, from 11:00 p.m. to 7:00 a.m., and he takes the same interstate ramp to work everyday.  *Id.*, pp. 184, 242.  Cohen said that on the night in question, the light was in flashing mode at about 9:50 p.m.  *Id.*, pp. 242-243.  He said that at other hours, for example, after 6:00 a.m., it cycles from green to yellow to red.  *Id.*, R. 243.  He was not asked to describe the operation of the light at 1:00 a.m. that night.

The deposition of Alan C. Otley is attached to Petitioner's Rule 3.850 motion. Doc. 9, Ex. E, R. 58-79.  Otley was a signal timing engineer responsible for the timing of signals.  *Id.*, R. 60.  Otley was advised that the collision occurred at about 1:07 a.m. on March 12, 1999.  *Id.*, R. 62.  Otley said that the local controller that controlled the cycling of the lights at the intersection was not connected to a larger system, and this local controller did not record the actual cycling of the lights on the day in question.  *Id.*, R. 63-64.  He said that there would be a service record for the local controller of that light, and Don Dobson maintained those records.  *Id.*, R. 64.  Otley said he had the record for the programming of the light, and the record showed that "it's programmed to go into flash operation between 2100 and six a.m."  *Id.*, R. 66.  This would mean that

Capital Circle would have a flashing yellow light, and the interstate ramp would have a

flashing red light.  *Id*.  Otley repeated that he had the light programmed to flash,

explaining: "Meaning programmed – I had written that down, and whether that was the

actual operation, I couldn't tell you.".  *Id*., R. 67.  Otley said that he had programmed the

light for flashing during these hours "probably a year or two before that," that is, before

March 12, 1999.  *Id*.

Otley said that the service record maintained by Dobson would tell whether the

light was actually set as Otley had instructed.  *Id*., R. 68.  He said he had looked at

those records, and had not seen anything to indicate that the light was not in flashing

mode, but when asked whether he had any reason to believe that the light at 1:00 a.m.

on March 12th was "in any form of operation other than flashing," Otley said: "I couldn't

tell you."  *Id*., R. 68-70.  Otley said that he had read a report that "some officer indicated

it was cycling" at 1:00 a.m. on that date.  *Id*., R. 70.  This was a "crash report" that is

furnished to Otley as a "standard procedure."  *Id*., R. 71.

Otley was then asked whether after he received the crash report he took any

action to determine whether that light was set as he had programmed it, and over the

course of several pages, Otley could not answer the question.  He said first that he was

not then aware of how that light was programmed since he had 250 intersections under

his supervision.  *Id*., R. 71.  He next said that he was not surprised that the light was

cycling rather than flashing because "a power surge or something like that" could have

made it "out of kilter."  *Id*., R. 72.  He said he requested information from Dobson, and

Dobson sent him "a copy of the reports," but he did not specify what reports he meant.

*Id*.  He vaguely thought that the light was checked a week or two later.  *Id*.  He said "I

don't know for sure if they had checked it or not" to determine whether it was operating properly. *Id.*, R. 73. He said it would have been Dobson who would have checked the operation. *Id.* He then said, that to the best of his knowledge, the light was operating as it had been programmed, in flashing mode. *Id.*, R. 74.

In summary, Otley could only have testified as to how he had "programmed" the light, meaning that he had instructed that the local controller for the light be set in a certain way, not how it was actually working that night. He repeatedly said that Dobson would be the person who would have better information as to the sequence pattern of the light that night. Dobson testified from an actual record of how the light was set that evening. Accordingly, neither attorney error nor prejudice to the outcome has been shown as to the failure of Petitioner's attorney to call Otley as a witness. Ground five is without merit.

### Ground Six: Whether counsel was ineffective for failing to move to suppress Petitioner's confession due to intoxication

Petitioner contends that he was confused at the time of his confession because he had taken Tylenol with Codeine. The gist of the confession as to which Petitioner now complains is that Petitioner admitted he "drove off because he had powder cocaine in his car." Doc. 1, p. 6g. Respondent concedes exhaustion of state court remedies as to this claim.

The trial court found that defense counsel did raise the issue of whether the interrogating officer, Deputy Gaines, was aware that Petitioner may have been medicated for pain and "raised the issue that defendant could not remember his address where he had lived most of his life." Doc. 9, Ex. E, R. 160. The court also

found that there was "overwhelming evidence against the defendant from which the jury could have found the defendant guilty," and thus, even if the admission had been suppressed, the outcome of the trial would not have been different.  *Id.*

Petitioner has not shown that the state court's adjudication of the merits of this federal claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  § 2254(d)(1).  The evidence at trial was that for a number of miles Petitioner drove 80 miles per hour, chased by numerous police cars with lights flashing and sirens on, and that he had 28 baggies of powder cocaine in the car.  It was obvious that Petitioner fled because he had 28 baggies of powder cocaine in the car.  His admission added nothing to the proof of these offenses.

### Ground Seven:  Whether the cumulative errors of counsel resulted in ineffective assistance of counsel

This ground is without merit because the individual claims of ineffective assistance of counsel are without merit.

## Conclusion

The state court's adjudication of these federal claims has not "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," nor has it "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  § 2254(d)(1) and (2).  Therefore, the petition should be denied.

Accordingly, it is **RECOMMENDED** that the petition for writ of habeas corpus filed by Albert Williams pursuant to 28 U.S.C. § 2254, challenging his convictions for manslaughter, two counts of felony fleeing and eluding an officer, possession of cocaine with intent to sell or deliver, and resisting an officer without violence, in the Circuit Court of the Second Judicial Circuit, in and for Leon County, Florida, case number R99-992-AF, be **DENIED WITH PREJUDICE**.

**IN CHAMBERS** at Tallahassee, Florida, on May 16, 2006.


s/    William C. Sherrill, Jr.
**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**



**<u>NOTICE TO THE PARTIES</u>**

**A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation. A party may respond to another party's objections within 10 days after being served with a copy thereof. Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**